Craig R. INGRAM, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

No. 10–463L.

United States Court of Federal Claims.

May 24, 2012.

Mark F. Herne, II, Arent Fox LLP, Clayton, Mo. for the plaintiffs. With him were Lindsay S.C. Brinton and Meghan S. Largent, Arent Fox LLP, Washington, D.C., and Debra J. Albin–Riley and Joseph L. Cavinato, III, Arent Fox LLP, Los Angeles, CA.

Peter C. Whitfield, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant. With him was Ignacia S. Moreno, Assistant Attorney General, Environment and National Resources Division.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiffs, who claim property interests along a rail line in Beaufort County, South Carolina, filed a complaint in the United States Court of Federal Claims alleging that the government caused uncompensated takings of their property interests pursuant to the Fifth Amendment to the United States Constitution. The rail line at issue in the above captioned case is the former Port Royal Railroad line, extending twenty-five miles between milepost AMJ–443.26 in Yemassee, South Carolina, to milepost AMJ–468.31 in Port Royal, South Carolina. The plaintiffs allege that the government effected the takings by allowing the conversion of railroad easements across their properties from rail use to trail use. The plaintiffs premise their claim on the United States Department of Transportation Surface Transportation Board's (STB) issuance of a Notice of Interim Trail Use (NITU) pursuant to the National Trails System Act (Trails Act), 16 U.S.C. §§ 1241–51 (2006).

In 1857, in the Port Royal Railroad Charter, the State of South Carolina granted the Port Royal Railroad Company (the Port Royal Railroad) the authority to condemn land to operate a railroad, pursuant to "An Act to Charter the Port Royal Railroad Company." The Port Royal Railroad Charter read, in pertinent part:

> *Be it enacted* by the Senate and House of Representatives, now met and sitting in General Assembly, and by the authority of the same, That for the purpose of establishing a communication by railroad from the waters of Port Royal Harbor, in the neighborhood of Beaufort, to some point on the Savannah River, passing near the Salcahatchie Bridge, the formation of a corporate Company is hereby authorized, to be called "The Port Royal Railroad Company"
>
> . . . . .
>
> That the said Company is hereby authorized to construct a railroad from the waters of Port Royal Harbor, in the neighborhood of Beaufort, to some point on the Savannah River, passing near the Salcahatchie Bridge, by a route to be determined by the said Company, after the same shall have been formed.
>
> . . . . .
>
> [A]ll the powers and privileges granted by the Charter of the Spartanburg and Union Railroad Company,[1] shall be, and are hereby granted to the Port Royal Railroad Company, subject to the conditions therein contained, except in so far as the special provisions of this Act may require the same to be modified or varied.
>
> That all questions concerning the right of way for said railroad, where the Company and the land owners cannot agree touching the same, shall be determined in the same manner as is provided by the tenth section of an Act, entitled "An Act to authorise [sic] the formation of the Greenville and Columbia Railroad Company," ratified on the fifteenth day of December, in the year of our Lord one thousand eight hundred and forty-five, for determining questions of right of way for said railroad.

In 1870, the South Carolina legislature amended the Port Royal Railroad Charter to extend the permissible amount of time to complete the railroad and to lengthen the life of the charter by fifty years. The Port Royal Railroad subsequently acquired portions of the rail line without the benefit of recorded instruments from the original landowners.

In addition to acquiring easements for portions of the rail line at issue in this case without the benefit of recorded instruments from landowners through condemnation, the Port Royal Railroad also acquired easements from certain landowners by written conveyances. Four portions of the Port Royal Railroad line established by conveyance also are at issue in the above captioned case. On May 27, 1870, William Fuller conveyed a right of way to the Port Royal Railroad (the Fuller deed). On July 23, 1870, Benjamin Mack conveyed a right of way to the Port Royal Railroad (the Mack deed). On May 1,

---

1. In 1847, the State of South Carolina Senate and House of Representatives granted the Spartanburg and Union Railroad condemnation authority in the Spartanburg and Union Charter, which stated, in pertinent part:

 That the said Spartanburg and Union Rail Road Company shall have the power and capacity to purchase, take and hold in fee simple [illegible] for years, to them and their successors, any lands, tenements, or hereditaments, that they may feel necessary for the site on and along which to locate, run and establish the Rail Road aforesaid, or to vary or to alter the plan or plane to such breadth or dimensions, through the whole course of the Road, as they may see fit. . . .

 That in any case where lands or private rights of way may be required by the said Company for the purposes aforesaid, and the same cannot be purchased from the owner or owners for want of agreement of the parties as to price, or from any other cause, the same make be taken by the Company at a valuation to be made by Commissioners. . . .

 That in the absence of any written contract between the said Company and the owner or owners of land, through which the said Rail Road may be constructed, in relation to said land, it shall be presumed that the land upon which the said Rail Road may be constructed, together with one hundred feet on each side of the centre of said road, has been granted to the said Company by the owner or owners thereof, and the said Company shall have good right and title to the same, (and shall have, hold and enjoy the same) unto them and their successors, so long as the same may be used only for the purpose of the said road and no longer. . . .

1873, Daniel F. Appleton conveyed an easement to the Port Royal Railroad (the Appleton deed). George Waterhouse and Anna S. Mulford conveyed a right of way to the Port Royal and Augusta Railway Company (the Mulford–Waterhouse deed), dated July 12, 1881.

The Port Royal Railroad merged into the Seaboard System Railroad, Inc. (Seaboard) and acquired the rights of way. In 1984, at Seaboard's request, the Interstate Commerce Commission[2] authorized Seaboard to abandon the rights of way. *See Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2008 WL 727785, at *1 (S.T.B. Mar. 18, 2009). Seaboard, however, did not abandon the rights of way, instead it transferred its interests in the line to the South Carolina State Ports Authority (Ports Authority). *See id.; see also Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2009 WL 1416460 (S.T.B. May 19, 2009). The Ports Authority then leased the rights of way to the South Carolina State Ports Commission, which is currently part of the State of South Carolina Division of Public Railways. *See Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2008 WL 727785, at *1. From 1985 to 2003, Tangent Transportation Company, Inc. (Tangent), a wholly owned subsidiary of the South Carolina State Ports Commission, operated the rail line pursuant to a modified certificate.[3] *See id.*

Tangent gave notice to the STB in 2003 that it intended to terminate service over the rail line due to Port Royal's closed port. In December 2006, however, Beaufort Railroad Company, Inc. (Beaufort Railroad), a subsidiary of the South Carolina Division of Public Railways, notified the STB that it would reactivate rail service along the rail line pursuant to a new modified certificate, which the STB issued that month.[4] *See Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2009 WL 2170143 (S.T.B. July 20, 2009). On July 16, 2008, Beaufort Railroad filed a notice of intent to terminate service over the entire rail line pursuant to the modified certificate that the STB had issued in 2006.

Subsequently, the Ports Authority and the Beaufort–Jasper Water and Sewer Authority (BJWSA) filed a joint request for a NITU, and informed the STB that the parties had entered into a "rail banking/interim trail use agreement, contingent upon the issuance of a NITU." *Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2009 WL 1416460, at *7. On May 20, 2009, the STB issued the NITU, which authorized the Ports Authority to negotiate a final trail use agreement with the BJWSA. The interim trail use/railbanking agreement, executed May 30, 2008, stated:

> WHEREAS PURCHASER [the BJWSA] seeks to purchase, pursuant to the National Trails System Act, 16 U.S.C. § 1247(d), all of SELLER's [the Ports Authority's] right, title and interest in all portions of the following rail corridors and all track structures approximately situated between the following mileposts: AMJ–443.37 to AMJ–468.31, including, but not limited to all bridges, culverts, track materials and

---

**2.** The STB assumed many of the Interstate Commerce Commission's (ICC) functions subsequent to the ICC's closure. *See* Interstate Commerce Commission Termination Act, Pub.L. 104–88, § 109 Stat. 803 (1995); *see also Toews v. United States*, 376 F.3d 1371 (Fed.Cir.), *reh'g denied* (Fed.Cir.2004).

**3.** As noted in the Joint Stipulation of Facts: "A modified certificate is a license that operators of state-owned rail lines can obtain and relinquish simply by giving the STB notice." Sections 1150.21–24 of Chapter 49 of the Code of Federal Regulations govern modified certificates of public convenience and necessity, and 49 C.F.R. § 1150.21, titled "scope of rules," states that "[t]hese special rules apply to operations over abandoned rail lines, which have been acquired

(through purchase or lease) by a State. The rail line must have fully abandoned, or [sic] approved for abandonment by the Board or a bankruptcy court." 49 C.F.R. § 1150.21 (current as of May 10, 2012).

**4.** In 2008, several landowners petitioned the STB to reconsider its decision to issue the modified certificate, claiming that the rail line had been abandoned. The STB found that Tangent's discontinuation of service along the rail line in 2003 did not constitute consummation of abandonment because the state had maintained the rail lines subsequent to Tangent's discontinuation of service. *See Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2008 WL 727785.

appurtenances, except as otherwise excluded as provided herein.

The interim trail use/railbanking agreement continued:

> In consideration of the foregoing premises and the mutual covenants and agreements herein contained, the SELLER agrees to sell to the PURCHASER and the PURCHASER agrees to purchase from the SELLER as is and by quit-claim, on the terms and conditions hereinafter set forth, all of such right, title and interest that SELLER may have in the Property located in Beaufort County ... together with and including all rails and improvements located thereon and all rights of SELLER to operate a railroad on, upon and across said Property, but excluding any parcels contiguous with the said railroad corridor which are not themselves part of the corridor....

On November 5, 2009, the Ports Authority quitclaimed its interest in the rail line to the BJWSA. The quitclaim deed impacted the twenty-five linear miles of rail line between Yemassee, South Carolina and Port Royal, South Carolina. The quitclaim deed stated that the conveyance was:

> subject to and in conformance with (i) the provisions of the National Trails System Act, 16 U.S.C. Section 1247(d); and (ii) the Contract to Purchase and interim Trail Use/Railbanking Agreement between the parties dated May 30, 2008, as amended, which is incorporated herein by reference, has remised, released and forever quit-claimed, and by these presents does hereby remise, release and forever quit-claim unto the said Grantee [BJWSA] all of its right, title and interest in and to the following described property....

By conveying the rail line to the BJWSA, which was considered the "trail sponsor," the rights of way were converted to interim trail use. *See* 16 U.S.C. § 1247(d) (2006).

The plaintiffs filed suit in the United States Court of Federal Claims alleging that the NITU issued on May 20, 2009, and the agreement to use the easements running across the plaintiffs' parcels of land for trail purposes, constituted uncompensated takings in violation of the Fifth Amendment to the United States Constitution. The plaintiffs' property interests [5] fall into one of five categories: (1) properties abutting and underlying [6] the railroad easements established by the Port Royal Railroad Charter; [7] (2) prop-

---

5. The parties have jointly stipulated that each plaintiff claimed a property interest at the time the STB issued the NITU, and each plaintiff also claimed a property interest at the time the plaintiffs filed the complaint.

6. The Joint Stipulation of Facts submitted by the parties uses the terms "abut" and "underlie," but does not define either term.

7. The parties whose property interests are associated with the Port Royal Railroad Charter are: John Stevenson Barker and Mikell B. Barker (the Barker properties are identified by the Beaufort County Assessor's Office by Property Identification (PID) # R100 006 000 0036 0000 and # R100 006 000 036A 0000); Beaufort Auto Repair & Towing, L.L.C (PID # R100 025 000 0013 0000); Beaufort Six Partners (PID # R100 029 0010 0000); E. Brent Cooper and Karen D. Cooper–Haber, as tenants in common (PID # R100 006 000 034B 0000); Deirdre D. DuBose (PID # R120 003 000 0440 0000); Michael A. Dunn (PID # R120 008 000 0559 0000); Earl R. Dupriest, III (PID # R120 008 000 023C 0000 and # R111 008 000 0541 0000) (this property abuts a segment of the right of way established by the Appleton deed); Glenn D. Guidroz and Loretta A. Guidroz (PID # R120 008 000 0406 0000); Madeline M. Harper Trust, c/o Frances

H. Hill, Trustee, and Frances H. Hill (PID # R120 005 000 0352 0000); James C. Mann (PID # R100 006 000 122A 0000); Lila Meeks, Virginia Meeks Shuman, and Sidney N. Meeks, as joint owners (PID # R700 035 000 0002 0000), and Lila Meeks and the aforementioned joint owners, as tenants in common (PID # R700 026 000 0046 0000); Ronald Richard Melter (PID # R120 003 000 686F 0000); Peter Miletic (PID # R120 008 000 0555 0000, # R700 019 000 0095 0000); Jack F. and Christina N. Nietert (PID # R120 006 000 0280 0000); Todd Palombo and Lewis P. Palombo, as tenants in common (PID # R100 006 000 0163 0000); Sheryl Pinkney–Maas (PID # R700 019 000 0181 0000); James Earl Simmons and Lana Michelle Simmons (PID # R120 005 000 0369 0000); Peter L. Singleton and Louise Botta Singleton (PID # R120 006 000 0481 0000); John J. Smith and Georgia L. Van Zyle (PID # R700 036 000 012E 0000); South Carolina Coast & Lakes, LLC (PID # R122 029 000 0253 0000, # R122 029 000 0401 0000); W. Richard Steele and Virginia M. Steele (PID # R100 006 000 0034 0000); the Town of Yemassee (PID # R710 001 000 0042 0000); the Trask Family Partnership (PID # R120 025 000 0012 0000, # R100 016 000A 0126 000, # R100 020 000 119A 0000); James H. Trask (PID # R100 025 000 012C 0000);

erties abutting and underlying the railroad easement established by the Fuller deed;[8] (3) properties abutting and underlying the railroad easement established by the Mack deed;[9] (4) properties abutting and underlying the railroad easement established by the Appleton deed;[10] and (5) properties abutting and underlying the railroad easement established by the Mulford–Waterhouse deed.[11]

Because the Port Royal Railroad acquired portions of the line without the benefit of recorded instruments from certain landowners through condemnation, there is no deed language associated with those property interests. The remaining conveyances at issue in the above captioned case originate in recorded instruments from landowners. "The Conveyance of Right of Way" from William Fuller to the Port Royal Railroad on May 27, 1870, reads, in pertinent part:

> Whereas the General Assembly of the State [of South Carolina] did on the twenty first day of December, in the year of our Lord one thousand eight hundred fifty-seven pass an Act to incorporate the Port Royal Railroad Company, for the purpose of establishing a communication by Railroad from the waters of Port Royal Harbor, in the neighborhood of Beaufort to some point on the Savannah River, passing near the Solcahatchie (sp?)[12] Bridge; wherein and whereby certain powers were conferred upon the said Company, and among them, the power to take & hold in fee simple, lands tenements or hereditaments, that they may find necessary, as well for the site on and along which to locate run and establish the said Railroad, as for the procuring and from time to time, readily obtaining proper materials for constructing, repairing grading and sustaining the same. And whereas the said Port Royal Railroad Company find the piece parcel or strip of land hereinafter more particularly described, necessary for the uses & purposes of the said Road. Now know by all men these presents that I William Fuller of the County of Beaufort in the State aforesaid in consideration of the premises and also in consideration of

Mark P. Ward (PID # R700 026 000 0035 0000); Debra Washington (PID # R100 020 000 118A 0000); Shirley Young (PID # R100 020 000 096B 0000); Lake Moultrie Water Co., Inc. (PID # R100 029 000 0254 0000) and Peoples Gas & Appliance of Beaufort, S.C., Inc. (PID # R100 029 000 0250 0000). The PID numbers in footnotes 7–11 are included for reference for future proceedings in the case. The parties shall confer and confirm that the PID numbers are correct and correspond to the correct plaintiffs.

8. The parties whose property interests are associated with the Fuller deed are the heirs of Arthur Bowman. While the plaintiffs indicate that the deed to the Bowman land (PID # R700 019 000 0058 0000) is not available, plaintiffs submitted a copy of the Beaufort County Assessor's Office 2009 tax record for this property with the second amended complaint to indicate that the heirs of Arthur Bowman claim title to the property in question. Moreover, the parties jointly stipulated that, "[t]he Heirs of Arthur Bowman acquired property in Beaufort County on January 30, 1952 by that deed recorded in the Beaufort County Recorder of Deeds' Office in Book 70, Page 431." (internal citation omitted).

9. The party whose property interest is associated with the Mack deed is Paula Bellamy, Co-Trustee of the Caroline L. Bellamy Revocable Trust (PID # R100 025 000 018A 0000).

10. The parties whose property interests are associated with the Appleton deed are: Affordable Home Rentals, Inc. (PID # R110 008 000 0141 0000); Fred S. Boggess (PID # R120 008 000 0416 0000); Bichvan T. Dang and Nho-Tran (PID # R120 008 000 0412 0000); Philip Fairbanks (PID # R110 010 000 042A 0000); Charles E. Friedman (PID # R110 010 000 0042 0000); Craig R. Ingram (PID # R110 008 000 0126 0000); Garner Jones (PID # R110 008 000 0143 0000); Reggie Newton Lohr, Jr. and Judith Moran Lohr (PID # R110 008 000 0138 0000, # R110 008 000 0131 0000, R110 008 000 0132 0000); Erin L. and Marsha D. Peets (PID # R110 008 000 0665, # R110 008 000 0666 0000); Sea Island Rentals, Inc. (PID # R110 008 000 0134 0000, # R110 008 000 0130 0000); Ernie and Laurie A. Watts (PID # R120 008 000 0396 0000); and Martha M. Woods (PID # R120 008 000 0393 0000).

11. The parties whose property interests are associated with the Mulford–Waterhouse deed are: Nibil LLC (PID # R120 003 000 712A 0000); and Donald P. O'Laughlin and Gloria H. O'Laughlin (PID # R120 005 000 0410 0000).

12. The parenthetical "(sp?)" was included in the transcription of the Fuller deed as an exhibit to the Joint Stipulation of Facts, but does not appear to be included in the photocopy of the original hand-written copy of the Fuller deed.

the sum of [illegible] [13] five dollars to me in hand paid by the Port Royal Railroad Company the receipt whereof I do hereby acknowledge, have granted bargained sold and released, and by these presents do grant, bargain sell and release unto the Port Royal Railroad Company all that piece parcel or strip of land measuring in length eight hundred & thirty-seven feet, and in width throughout its entire length one hundred feet, being part & parcel of a tract of land belonging to me the said Wm. Fuller situate in the County of Beaufort in the State aforesaid [Illegible] which the said railroad is to be constructed, and upon which the same is located, which said strip of land is fully and accurately delineated and described in a plat thereof and of the said Railroad. Provided nevertheless, that whenever it may become necessary for the said Company to occupy a space wider than the said width of the said strip of land to-wit 100 feet by reason of cutting and filling, it shall and may be lawful for them to occupy as much land outside the limits of the said strip as may be sufficient to deposit waste earth and construct embankments; that when the lands adjacent to the said strip are under construction it shall and may be lawful for me the said Wm. Fuller and my heirs and assigns from time to time, and at all times, to cultivate the same on both sides of the said road, and as near to the track thereof as may be convenient, without obstructing the use of the same, by the said Company. And provided also, that the said Company shall, at all times have the right to cut down and remove any tree or trees, which from the position or condition of it or them, may in any way endanger the track or property of the said Company, notwithstanding the said tree or trees may be without the limits of the said piece parcel or strip of land.

To have and to hold all and singular as the premises unto the said Port Royal Rail Road Company, their successors and assigns forever.

The "Release of Right of Way" from Benjamin Mack to the Port Royal Railroad on July 23, 1870, reads, in pertinent part:

Know all men by these presents that I, Benjamin Mack of the County of Beaufort in the State aforesaid, for divers good and sufficient reasons, especially for and in consideration of the sum of fifty ($50) dollars to me paid at the time of the sealing of these presents by the Port Royal Railroad Company in the State of South Carolina, the receipt whereof is hereby acknowledged, have granted bargained, sold and conveyed, and by these presents do grant bargain sell and convey unto the said The Port Royal Railroad Company and to their successors & assigns forever, all that parcel or strip of land situate on Port Royal Island in the County of Beaufort and State aforesaid being a part of lot number (20) twenty ... meaning thereby to convey to the said Rail Road Company the right of way over and through my said lot of land. Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and all the estate right title interest property possession, claim and demand whatsoever of the said Benjamin Mack of in or to the above described premises, and every part and parcel thereof with the appurtenances to have and to hold forever.

The "Lien Claims Deed" from Daniel F. Appleton to the Port Royal Railroad on May 1, 1873, reads, in pertinent part:

This Indenture made the first day of May in the year one thousand and eight hundred and seventy three between Daniel F. Appleton of the County City and State of New York party of the first part, and the Port Royal Rail Road Company of the State of South Carolina & Georgia party of the second part.

Witnesseth, that the said party of the first part, for and in consideration of the sum of one dollar and other valuable considerations, lawful money of the United States of America to him in hand paid by the said party of the second part, at or before the

---

13. The word "illegible," which appears twice in the Fuller deed was included in the transcription of the Fuller deed as an exhibit to the Joint Stipulation of Facts, but does not appear to be included in the photocopy of the original handwritten copy of the Fuller deed.

sealing and delivery of these present, the receipt whereof is hereby acknowledged, hath remised released and quitclaimed, and by these presents doth remise release and quit-claim unto the said party of the second part and to their heirs and successors and assigns forever.

All those three parcels of land situate in the City of Port Royal County of Beaufort and State of South Carolina recorded and described as follows .... [property description] The said grant [illegible] [14] being forty acres of land at Port Royal for the use of the said Rail Road, which said three pieces of land have been surveyed and set apart by George Gage Engineer of said Port Royal Rail Road in accordance with an agreement between the parties herein. And the said Railroad Company hereby agrees to accept the three pieces of land herein described in place of forty acres in one lot acquired by the said agreement....

Together with all and singular the tenements hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title, interest, property, possession, claim and demand whatsoever as well in law or in equity of the said party of the first part of, in or to the above-described premises and every part and parcel thereof with the appurtenances.

To have and to hold all and singular the above mentioned and described premises together with the appurtenances unto the said party of the second part their heirs successors and assigns forever.

The "Conveyance" from George Waterhouse and Anna S. Mulford to the Port Royal and Augusta Railroad Company, dated July 12, 1881, reads, in pertinent part:

Know all men by these presents that we, George Waterhouse, Beaufort in the State aforesaid and Mrs. Anna S. Mulford widow, Millville in the State of New Jersey for and in consideration of the sum of One dollar to us paid by the Port Royal and Augusta Railway Company a [illegible] [15] petition and corporate by and under the laws of the State of South Carolina receipt whereof is hereby acknowledged, have granted bargained, sold and released and by these presents do grant bargain sell and convey unto the said the Port Royal and Augusta Railroad Company All that piece parcel or strip of land situated lying and being on Port Royal Island in the County of Beaufort and the State of South Carolina being a part of the plantation known as "Fuller Hermitage" and described as follows to-wit: Commencing at the southern boundary of the said Fuller Hermitage at a point seventy five (75) feet West of the Center of the track of the Port Royal and Augusta Railway Company and subsiding thence South one thousand one hundred and fifty feet (1150) on a line parallel with said track thence east forty-five feet (45) thence south two thousand seven hundred feet (2700) on a line parallel with said track thence east across said track sixty feet (60) thence south two thousand seven hundred feet (2700) on a line parallel with said track thence east forty-five (45) thence north one thousand one hundred and fifty feet (1150) on a line parallel with said track thence west across said track one hundred and fifty feet to the place of beginning measuring and continuing seven and two thirds acres (7 2/3) more or less upon which said strip the [sic] track of the said Port Royal and Augusta Railway Company has been constructed to have and to hold the said strip of land unto the said Port Royal and Augusta Railway Company, their successors and assigns for the purpose of the operation of the said

14. As in the Fuller deed, the word "illegible" was included in the transcription of the Appleton deed as an exhibit to the Joint Stipulation of Facts, but does not appear to be included in the photocopy of the original hand-written copy of the Appleton deed.

15. As in the Fuller and Appleton deeds, the word "illegible" was included in the transcription of the Waterhouse–Mulford deed as an exhibit to the Joint Stipulation of Facts, but does not appear to be included in the photocopy of the original hand-written copy of the Waterhouse–Mulford deed.

road so long as the same shall be used for such highway and no longer.

Previously, the court dismissed from the above captioned case claims brought by a number of the property owners included in the original complaint. The property owners who were dismissed from the above captioned case alleged that their property interests derived from railroad easements established pursuant to the Port Royal Railroad Charter, but their property interests did not abut the subject easement or, alternatively, the plaintiffs could not establish that they owned their property interest as of the date the NITU was issued. The dismissed plaintiffs and their properties are: Clayton C. Barnard, Managing Member, C.C. Barnard, LLC (PID # R100 026 00A 0266 0000, # R100 026 00A 0267 0000, # R100 026 00A 0268 0000 (dismissed May 5, 2011) and PID # R100 029 000 002A 0000 (dismissed April 21, 2011)); Ronald G. Barnard, Trustee, the Ronald G. Barnard Trust dated April 29, 2004 (PID # R100 026 00A 0299 0000, # R100 026 00A 0263 0000, # R100 026 00A 0298 0000 (dismissed May 5, 2011)); Frederick E. Bley, Jr. (PID # R100 026 000 148A 0000 (dismissed April 21, 2011)); Janice B. Cappelmann, Trustee, the Janice B. Cappelmann Trust (PID # R100 012 000 010A 0000 (dismissed April 21, 2011)); and James Sneed, Jr. (PID # R100 025 000 023A 0000 (dismissed April 21, 2011)). The court also dismissed from the above captioned case two additional parcels owned by Erin L. and Marsha D. Peets (PID # R110 008 000 365B 0000, # R110 008 000 0667 0000 (dismissed April 21, 2011)), who alleged that their properties abutted the railroad easement pursuant to the Appleton deed. Erin L. and Marsha D. Peets, however, still claim separate and surviving interests in the case pursuant to the Appleton deed (PID # R110 008 000 0665 and # R110 008 000 0666 0000).

The parties have been working together and have negotiated settlements on a number of key issues. The government states, it "does not believe a determination of liability is necessary to reach a settlement in this matter." The parties also have agreed that easements, and not fee interests, are at issue in the above captioned case. In addition, the government indicates that for the purposes of settlement and compromise, regarding the plaintiffs in this case, "the United States agrees to assume that recreational trail use is beyond the scope of a railroad purposes easement under South Carolina law." The defendant's cross-motion for partial summary judgment states, "[t]he parties do not dispute that, at one time, a railroad easement burdened Plaintiffs' properties."

The parties also indicate they will try to resolve specific title issues and engage in "a cooperative effort to determine the impact that the NITU may have on the market value of Plaintiffs' property." In this regard, the parties have agreed that the "proper method to determine the value of each owner's property affected by the Trails Act is for an appraiser to determine the fair market value of the landowner's entire parcel of property in a 'before taken' condition and in an 'after taken' condition." According to the parties, the difference between these two values represents the value of the property interest taken by the Trails Act. "The parties also agree that, in its 'after taking' condition, the property is encumbered by those easements created and perpetuated by the Trails Act, including an easement for so-called 'railbanking' (the STB's continuing jurisdiction to authorize any railroad to construct a new railroad line across the land) and for current use by the public for interim trail use and related recreation."

In its cross-motion for partial summary judgment, the defendant further states: "Consistent with the parties' efforts to resolve this matter through negotiation and compromise, Plaintiffs and the United States have agreed to engage in a joint appraisal project designed to measure the value of the property interest Plaintiffs allege the United States has taken in this case." To this end, the plaintiffs note, "that the landowners and the government have agreed to use the South Carolina commercial real estate appraiser, Patrick Keenan, as a common appraiser to determine the value of each Plaintiff's property subject to the NITU." The parties also indicate that they "have agreed to settle the interest rate to be applied in the settlement of certain Plaintiffs' properties in this case."

The parties, however, do not agree on how to determine the value of the properties before the NITU was issued. As indicated in the plaintiffs' motion for partial summary judgment, "[t]he parties cannot agree, however, on the condition of the property as it is to be appraised in the 'before taken' condition." Or, as similarly noted by the defendant, the "Court need only address whether a railroad easement burdened Plaintiffs' property at the time the STB issued the NITU." The dispute was articulated by the parties in a joint filing submitted to the court as follows:

> The Plaintiffs' position is that upon the STB's issuance of the NITU, the federal government destroyed the "reversionary" interest Plaintiffs otherwise held in their property to regain full, unencumbered use of the land free of the railroad easement upon abandonment. As such, the proper standard for measuring the "before" value is to appraise the Plaintiffs' property *unencumbered* by a railroad easement. The Defendant's position is that, at the time the STB issued the NITU, a railroad easement encumbered Plaintiffs' property. Because this easement existed at the time the NITU was issued, the United States believes that an appraisal of the property in the "before" condition must account for the easement. (emphasis in original).

## DISCUSSION

The parties have filed cross-motions for partial summary judgment on the limited issue of how to value the plaintiffs' properties prior to the issuance of the NITU. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2011) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar, both in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed.R.Civ.P. 56(a) (2012); *see also Alabama v. North Carolina,* —— U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed.Cir.2010); *Consol. Coal Co. v. United States,* 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States,* 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States,* 553 F.3d 1375, 1378 (Fed.Cir.2009); *Casitas Mun. Water Dist. v. United States,* 543 F.3d 1276, 1283 (Fed.Cir. 2008), *reh'g and reh'g en banc denied,* 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States,* 404 F.3d 1335, 1342 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2005); *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1370–71 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2004), *cert. denied,* 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Cohen v. United States,* 100 Fed.Cl. 461, 469 (2011); *Boensel v. United States,* 99 Fed.Cl. 607, 610 (2011). A fact is material if it will make a difference in the result of a case under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Thompson v. United States,* 101 Fed.Cl. 416, 426 (2011); *Cohen v. United States,* 100 Fed.Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Walker v. United States,* 79 Fed.Cl. 685, 692 (2008); *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477

U.S. at 249, 106 S.Ct. 2505; *see, e.g., Schlup v. Delo*, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Cohen v. United States*, 100 Fed.Cl. at 469–70; *Boensel v. United States*, 99 Fed.Cl. at 611; *Macy Elevator, Inc. v. United States*, 97 Fed.Cl. 708, 717 (2011); *Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States*, 87 Fed.Cl. 113, 126 (2009); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 52 Fed.Appx. 507 (Fed. Cir.2002), *published at* 317 F.3d 1331 (Fed. Cir.2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1316 (Fed.Cir. 2001); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment: saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (quoting *Pure Gold, Inc. v. Syntex, (U.S.A.) Inc.*, 739 F.2d 624, 626 (Fed.Cir.

1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992) (citation omitted); *see also Metric Constr. Co., Inc. v. United States*, 73 Fed.Cl. 611, 612 (2006).

■ Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Takeda Pharm. Co. v. Doll*, 561 F.3d 1372, 1375 (Fed.Cir. 2009); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied*, 555 U.S. 812, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999); *Gonzales–McCaulley Inv. Group, Inc. v. United States*, 101 Fed.Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Ricci v. DeStefano*, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Yant v. United States*, 588 F.3d 1369, 1371 (Fed.Cir.2009), *cert. denied*, —— U.S. ——, 131 S.Ct. 69, 178 L.Ed.2d 23 (2010); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 272 F.3d 1365, 1369 (Fed.Cir.2001), *reh'g and reh'g en banc denied*, 293 F.3d 1364 (Fed.Cir. 2002), *cert. denied*, 539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir.1998); *see also Am. Pelagic Co. v. United States*, 379 F.3d at 1371 (citing *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1345–46 (Fed.Cir.2000)); *Boensel v. United States*, 99 Fed.Cl. at 611 (" 'The evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Casitas Mun. Water Dist. v. United States*, 543 F.3d at 1283, *Lathan Co. Inc. v. United States*, 20 Cl.Ct. 122, 125 (1990))). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369, 1374 (Fed.Cir.2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Riley & Ephriam Constr. Co. v. United States*, 408 F.3d 1369, 1371 (Fed.Cir.2005); *Crown Operations Int'l Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002); *Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.*, 109 F.3d 739, 741 (Fed. Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1995)), *reh'g denied and en banc suggestion declined* (Fed.Cir.1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir. 1997); *Dana R. Hodges Trust v. United States*, 101 Fed.Cl. 549, 553 (2011). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed.Cir.2009); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d at 1244; *Florida Power & Light Co. v. United States*, 375 F.3d 1119, 1124 (Fed.Cir.2004); *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001); *Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed.Cir.2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed.Cir.2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed.Cir.2009); *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001); *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), *reh'g denied and en banc suggestion declined* (Fed. Cir.1999); *Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *Rogers v. United States*, 90 Fed.Cl. 418, 427 (2009), *subsequent determination*, 93 Fed.Cl. 607 (2010); *Consol. Coal Co. v. United States*, 86 Fed.Cl. 384, 387 (2009), *aff'd*, 615 F.3d 1378 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *St. Christopher Assocs., L.P. v. United*

*States,* 75 Fed.Cl. 1, 8 (2006), *aff'd,* 511 F.3d 1376 (Fed.Cir.2008); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or otherwise stated, in favor of the non-moving party. *See First Commerce Corp. v. United States,* 335 F.3d 1373, 1379 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2003); *see also DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *Oswalt v. United States,* 85 Fed.Cl. 153, 158 (2008); *Telenor Satellite Servs., Inc. v. United States,* 71 Fed.Cl. 114, 119 (2006).

■ Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *See B.F. Goodrich Co. v. United States Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Rogers v. United States,* 90 Fed.Cl. at 427; *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998).

"Questions of law are particularly appropriate for summary judgment." *Oenga v. United States,* 91 Fed.Cl. 629, 634 (2010) (citing *Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.1999) ("Summary judgment was appropriate here [in *Dana Corp.*] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")).

At this juncture of the above captioned case, the parties have submitted to the court a joint statement identifying a single issue of law for resolution: whether the valuation of the taken property in its "before taken" condition should account for an existing railroad easement that later would be converted into a trail, or whether the property should be valued as unencumbered by any easement in its "before taken" condition. The parties agree that no material facts are in dispute and that the single issue presented may be resolved by partial summary judgment proceedings.

Pursuant to the Tucker Act, the United States Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00, "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006).

■ The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *see also Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978); *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *E. Enters. v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Rose Acre Farms, Inc. v. United States,* 559 F.3d 1260, 1266 (Fed. Cir.), *reh'g en banc denied* (Fed.Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1501, 176 L.Ed.2d 109 (2010); *Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Resource Invs., Inc. v. United States,* 85 Fed. Cl. 447, 469–70 (2009); *Pumpelly v. Green Bay & Miss. Canal Co.,* 80 U.S. (13 Wall.) 166, 179, 20 L.Ed. 557 (1871) (citing to principles which establish that "private property

may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified.").

■ Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *E. Enters. v. Apfel,* 524 U.S. at 520, 118 S.Ct. 2131 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016–19, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)); *see also Acceptance Ins. Cos. v. United States,* 503 F.3d 1328, 1336 (Fed.Cir.2007); *Morris v. United States,* 392 F.3d 1372, 1375 (Fed.Cir.2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." *Preseault v. Interstate Commerce Comm'n,*[16] 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); *see also Lion Raisins, Inc. v. United States,* 416 F.3d 1356, 1368 (Fed.Cir.2005); *Narramore v. United States,* 960 F.2d 1048, 1052 (Fed.Cir.1992); *Perry v. United States,* 28 Fed.Cl. 82, 84 (1993).

■ To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. *See Adams v. United States,* 391 F.3d 1212, 1218 (Fed.Cir.2004), *cert. denied,* 546 U.S. 811, 126 S.Ct. 330, 163 L.Ed.2d 43 (2005); *Arbelaez v. United States,* 94 Fed.Cl. 753, 762 (2010); *Gahagan v. United States,* 72 Fed.Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1377–78 (Fed.Cir.), *cert. denied,* 555 U.S. 1045, 129 S.Ct. 626, 172 L.Ed.2d 608 (2008).

■ The Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. *See Klamath Irr. Dist. v. United States,* 635 F.3d 505, 511 (Fed.Cir.2011); *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372 (citing *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995)). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. Then, the court must determine whether the government action is a " 'compensable taking of that property interest.' " *Huntleigh USA Corp. v. United States,* 525 F.3d at 1377 (quoting *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d at 1372).

■ A takings plaintiff must have a legally cognizable property interest, such as the right of possession, use or disposal of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing *United States v. Gen. Motors Corp.,* 323 U.S.

---

**16.** *Preseault v. Interstate Commerce Commission,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1, is a 1990 United States Supreme Court decision and is sometimes referred to as *Preseault I.* In *Preseault I,* the Supreme Court concluded that although the Trails Act represented a valid exercise of Congressional power under the Commerce Clause of the United States Constitution, when railroad rights of way are converted to interim public trail use under the Trails Act, the Trails Act taking of private property cannot occur without just compensation. *See generally Preseault I,* 494 U.S. 1, 110 S.Ct. 914. Subsequently, in 1996, the United States Court of Appeals for the Federal Circuit issued a decision also involving the Preseaults, *Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996), sometimes referred to as *Preseault II.* As explained by the Federal Circuit in *Preseault II,* "[t]he Preseaults own a fee simple interest in a tract of land.... The dispute centers on three parcels within this tract, areas over which the original railroad right-of-way ran." *Id.* at 1531. In *Preseault II,* the Federal Circuit concluded that "[w]hen state-defined property rights are destroyed by the Federal Government's preemptive power in circumstances such as those here before us, the owner of those rights is due just compensation." *Preseault II,* 100 F.3d at 1552.

373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *CRV Enters., Inc. v. United States,* 626 F.3d 1241, 1249 (Fed.Cir.2010), *cert. denied,* — U.S. —, 131 S.Ct. 2459, 179 L.Ed.2d 1211 (2011); *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374–75 (Fed.Cir.), *reh'g denied and en banc suggestion denied* (Fed.Cir. 2000), *cert. denied,* 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001). " 'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.' " *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372 (quoting *Wyatt v. United States,* 271 F.3d 1090, 1096 (Fed.Cir.2001), *cert. denied* 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002) and citing *Cavin v. United States,* 956 F.2d 1131, 1134 (Fed.Cir.1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372 (citing *Maritrans Inc. v. United States,* 342 F.3d 1344, 1352 (Fed.Cir.2003) and *M & J Coal Co. v. United States,* 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." *Air Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1213 (Fed.Cir.) (citing *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1381 and *Conti v. United States,* 291 F.3d 1334, 1340 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2002), *cert. denied,* 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003)), *reh'g denied and reh'g en banc denied* (Fed.Cir.2005). Only if there is to be a next step, "after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." *Huntleigh USA Corp. v. United States,* 525 F.3d at 1378 (quoting *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372).

■ If a plaintiff has a valid property interest, the government takes that interest by destroying, physically occupying, or excessively regulating it for a public purpose. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* — U.S. —, 130 S.Ct. 2592, 2601, 177 L.Ed.2d 184 (2010); *Boyle v. United States,* 200 F.3d 1369, 1374 (Fed.Cir. 2000). " 'When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.' " *Brown v. Legal Found. of Wash.,* 538 U.S. 216, 233, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321–23, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)) (citations omitted); *see also John R. Sand & Gravel Co. v. United States,* 457 F.3d 1345, 1357 (Fed.Cir.) ("[A] permanent physical occupation by the government is a per se physical taking requiring compensation under the Fifth Amendment because it destroys, among other rights, a property owner's right to exclude."), *reh'g en banc denied* (Fed.Cir.2006), *aff'd,* 552 U.S. 130, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). The United States Supreme Court has indicated that when "deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . ." *Penn Central Transp. Co. v. City of New York,* 438 U.S. at 130–31, 98 S.Ct. 2646. If a plaintiff does possess a property interest, the court decides if the "property has been deprived or abridged sufficiently to qualify as 'taken.' " *Northwest La. Fish & Game Pres. Comm'n v. United States,* 574 F.3d 1386, 1390 (Fed.Cir.2009) (quoting *Members of Peanut Quota Holders Ass'n v. United States,* 421 F.3d 1323, 1330 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2005), *cert. denied,* 548 U.S. 904, 126 S.Ct. 2967, 165 L.Ed.2d 951 (2006)), *cert. denied,* — U.S. —, 130 S.Ct. 1072, 175 L.Ed.2d 886 (2010); *see also Acceptance Ins. Cos. v. United States,* 583 F.3d 849, 854 (Fed.Cir.2009), *cert. denied,* — U.S. —, 130 S.Ct. 2402, 176 L.Ed.2d 922 (2010); *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir. 2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Wyatt v. United States,* 271 F.3d at 1099–1100; *Karuk Tribe of Cal. v. Ammon,* 209 F.3d at 1374.

The STB has authority to regulate most railroad lines in the United States. *See* 49

U.S.C. § 702 (2006). A railroad seeking to abandon any part of its railroad line must either (1) file an application to abandon or (2) file a notice of exemption to abandon the line. *See* 49 U.S.C. § 10903 (2006); *see also* 49 C.F.R. § 1152.50 (2012). "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." *Caldwell v. United States*, 391 F.3d 1226, 1228–29 (Fed. Cir.) (citing *Preseault I*, 494 U.S. at 6–8, 110 S.Ct. 914), *reh'g en banc denied* (Fed.Cir.), *cert. denied*, 546 U.S. 826, 126 S.Ct. 366, 163 L.Ed.2d 72 (2005).

By operation of the Trails Act, the STB may issue a NITU, "suspending exemption proceedings for 180 days to allow a third party to enter into an agreement with the railroad to use the right-of-way as a recreational trail." *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2006), *cert. denied*, 549 U.S. 1209, 127 S.Ct. 1328, 167 L.Ed.2d 81 (2007). Section 8(d) of the Trails Act, "allows a railroad to negotiate with a state, municipal, or private group ('the trail operator') to assume financial responsibility for operating the railroad right of way as a recreational trail." *See Bright v. United States*, 603 F.3d 1273, 1275 (Fed.Cir.) (citing *Caldwell v. United States*, 391 F.3d at 1229), *reh'g and reh'g en banc denied* (Fed.Cir.2010). If the railroad and an authorized trail provider [17] reach an agreement, the NITU extends indefinitely, and the corridor is railbanked, with interim trail use permitted. *See* 49 C.F.R. § 1152.29(d)(1)–(2) (current through April 19, 2012) ("The NITU will indicate that interim trail use is subject to future restoration of rail service ... [t]he NITU will also provide that, if the user intends to terminate trail use, it must send the [STB] a copy of the NITU and request that it be vacated on a specific date."); *see also Caldwell v. United States*, 57 Fed.Cl. 193, 194 (2003) (quoting

*Neb. Trails Council v. Surface Transp. Bd.*, 120 F.3d 901, 903 n. 1 (8th Cir.1997)) ("The term railbanking refers to the 'preservation of railroad corridor for future rail use,' while making the corridor available for other activities."), *aff'd*, 391 F.3d 1226 (Fed.Cir.2004), *reh'g en banc denied* (Fed.Cir.), *cert. denied*, 546 U.S. 826, 126 S.Ct. 366, 163 L.Ed.2d 72 (2005). When the NITU extends indefinitely and the corridor is railbanked, the STB retains jurisdiction and abandonment of the rail corridor is blocked. *See* 16 U.S.C. § 1247(d) ("[I]n the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.").

■ As described by the United States Court of Appeals for the Federal Circuit:

Thus, section 8(g) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." Rail Abandonments–Use of Rights–of–Way as Trails, Ex Parte No. 274 (Sub–No. 13), 2 I.C.C.2d 591, 1986 WL 68617 (1986). A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail. *See Preseault II*, 100 F.3d at 1552; see also *Toews* [*v. United States* ], 376 F.3d at 1376.

*Caldwell v. United States*, 391 F.3d at 1229

The Federal Circuit has established a three-part inquiry to determine takings liability in cases involving the conversion of railroad rights of way to a recreational trail via 16 U.S.C. § 1247(d) of the Trails Act:

---

17. The Trails Act indicates that a trail provider may be "a State, political subdivision, or qualified private organization [that] is prepared to assume full responsibility for management of such rights-of-way and for any legal liability aris-

ing out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way." 16 U.S.C. § 1247(d).

(1) who owned the strips of land involved, specifically did the Railroad ... acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

*Preseault II,* 100 F.3d at 1533. Phrased differently, the Federal Circuit more recently indicated:

the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

*Ellamae Phillips Co. v. United States,* 564 F.3d 1367, 1373 (Fed.Cir.2009) (citing *Preseault II,* 100 F.3d at 1533).

According to the United States Court of Appeals for the Federal Circuit, "[i]t is settled law that a Fifth Amendment taking occurs in Rails–to–Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States,* 630 F.3d 1015, 1019 (Fed.Cir.2010), *reh'g and reh'g en banc denied,* 646 F.3d 910 (Fed.Cir.2011); *see also Ellamae Phillips Co. v. United States,* 564 F.3d at 1373. "It is the law-created right to own private property, recognized and enforced by the Constitution, legislation, and common law, that gives the owner an historically rooted expectation of compensation." *Preseault II,* 100 F.3d at 1540. The Federal Circuit in *Preseault II* also indicated "that power includes the power to preempt state-created property rights, including the rights to possession of property when railroad easements terminate. However, as Justice O'Connor succinctly pointed out in her concurring opinion in *Preseault I,* having and exercising the power of preemption is one thing; being free of the Constitutional obligation to pay just compensation for the state-created rights thus destroyed is another." *Id.* at 1537 (citing *Preseault I,* 494 U.S. at 22, 110 S.Ct. 914).

The parties have agreed that the Port Royal Railroad acquired only easements for the properties at issue in the above captioned case. For purposes of settlement and compromise, the United States agrees to "assume that recreational trail use is beyond the scope of a railroad purposes easement under South Carolina law." Because the Port Royal Railroad acquired only easements, and because the easements were not sufficiently broad to contemplate trail use, the government is liable to the plaintiffs in the above captioned case for the property interests that it has taken.

▮▮▮▮ To determine the nature of the property interest, the court looks to state law. The United States Court of Appeals for the Federal Circuit, interpreting a takings claim for a railroad right of way, stated that, "state law generally creates the property interest in a railroad right-of-way." *Barclay v. United States,* 443 F.3d at 1374 (citing *Preseault I,* 494 U.S. at 8, 16, 110 S.Ct. 914). In a footnote on the same page, the court repeated, "[i]n *Toews v. United States,* 376 F.3d 1371 (Fed.Cir.2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way." *Barclay v. United States,* 443 F.3d at 1374 n. 4. "The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred. 'State law creates and defines the scope of the reversionary or other real property interests affected by the ICC's [Interstate Commerce Commission] action pursuant to Sec-

tion 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d).'" *Chevy Chase Land Co. of Montgomery Cnty. v. United States*, 37 Fed.Cl. 545, 565 (1997) (quoting *Preseault I*, 494 U.S. at 20, 110 S.Ct. 914 (O'Connor, J., concurring) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1001, 104 S.Ct. 2862)), *aff'd*, 230 F.3d 1375 (Fed.Cir.1999), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000); *see also Whispell Foreign Cars, Inc. v. United States*, 97 Fed.Cl. 324, 331 ("Whether an individual has a compensable private property interest is determined by state law."), *amended after recons. in part*, 100 Fed.Cl. 529 (2011).

While *Chevy Chase Land Co. of Montgomery County v. United States* and *Preseault I* specifically addressed the application of state law to be applied in rails to trails cases, the United States Supreme Court has made similar pronouncements about state law governing how determinations are made regarding property conveyances. For example, in *Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1001, 104 S.Ct. 2862, the Supreme Court stated, "we are mindful of the basic axiom that '"[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."'" (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972))) (omission in original). In *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), the United States Supreme Court stated that, "[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." *Id.* at 378, 97 S.Ct. 582; *see also Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 155, 64 S.Ct. 474, 88 L.Ed. 635 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state."). The United States Court of Appeals for the Federal Circuit also has directed that state law determines whether trail use exceeds the scope of the easement. *See generally Toews v. United States*, 376 F.3d 1371; *see also Preseault II*, 100 F.3d at 1541–42. Therefore, to determine if the value of the properties in this case, which are located in South Carolina, should account for an existing easement on the property at the time of the taking, or if the properties should be valued as unencumbered by any easement in its "before taken" condition, the court looks to South Carolina law.

According to the plaintiffs, "[b]ut for the federal Trails Act's preemption and destruction of their state-law reversionary title to their land," they would have "regained the right to exclusive title and possession of their property unencumbered by any railroad right of way easement and unencumbered by any easement for public recreation." The plaintiffs argue, therefore, that "the property which the government has taken from these landowners should be valued in the 'before taken' condition as unencumbered by those easements established or perpetuated by the federal Trails Act." The plaintiffs assert that "[i]n a Trails Act taking, the STB's issuance of the NITU 'effectively eliminates' and 'destroys' the landowner's state-law 'reversionary' interest in their property." Moreover, plaintiffs argue that under Federal Circuit precedent, a "compensable taking under the Trails Act arises 'when the government takes action which deprives landowners of "possession of their property unencumbered by [an] easement."'" (quoting *Navajo Nation v. United States*, 631 F.3d 1268, 1275 (Fed.Cir. 2011) (quoting *Ladd v. United States*, 630 F.3d 1015, 1023 (Fed.Cir.2010))) (brackets in original). Plaintiffs state, "issuance of the NITU, which invokes [16 U.S.C.] § 1247(d) and preempts state-law property interests, deprives the landowners of their right to possession of their property *unencumbered* by any easement." (emphasis in original).

The defendant, however, contends that "the State of South Carolina did not abandon its property interest in the railroad corridor before the STB issued the NITU relevant to this case," and the property remained "sub-

ject to a railroad easement in the 'before' condition." The defendant argues that "the measurement of just compensation in this case must account for that encumbrance," necessarily resulting in a lower valuation of the properties' "before taken" value and, consequently, in a lower total measure of just compensation. The defendant asserts that the question for the court, therefore, is whether, when the NITU issued, was the land encumbered by the railroad easements, or had the easements been abandoned prior to the issuance of the NITU.

The South Carolina Supreme Court has stated that: "It is well settled that an easement may be lost by abandonment and in determining such question the intention of the owner to abandon is the primary inquiry." *Carolina Land Co., Inc. v. Bland,* 265 S.C. 98, 217 S.E.2d 16, 21 (1975). According to South Carolina law:

> The question of whether a railroad has abandoned its right-of-way is ordinarily a question of fact. *Lorick & Lowrance, Inc. v. Southern Ry. Co.,* 87 S.C. 71, 68 S.E. 931 (1910). In *Lorick & Lowrance* the court said that in order to destroy the rights of the railroad to a right-of-way under a statute similar to the one in this case "there must be shown either a use separate and distinct from railroad purposes or nonuse for railroad purposes under such circumstances as to indicate an intention to abandon the right-of-way." *Id.* at 74, 68 S.E. at 931. The doctrine of abandonment as it relates to railroads is stated in the case of *Raleigh, C. & S. Ry. Co. v. McGuire,* 171 N.C. 277, 280, 88 S.E. 337, 339 (1916):

> It includes both the intention to abandon and the external act by which such intention is carried into effect. There must be a concurrence of the intention with the actual relinquishment of the property. It is well settled that to constitute an abandonment or renunciation of a claim to property there must be acts and conduct,

positive, unequivocal and inconsistent with the claims of title.

*Eldridge v. City of Greenwood,* 300 S.C. 369, 388 S.E.2d 247, 250–51 (App.1989) (*Eldridge I* ); *see also Raulerson v. United States,* 99 Fed.Cl. 9, 11 (2011).

In addition, the South Carolina Supreme Court has indicated that an external act expressing intent to abandon may be found in a number of ways:

> The intention to abandon need not appear by express declaration, but may be inferred from all of the facts and circumstances of the case. It may be inferred from the acts and conduct of the owner and the nature and situation of the property, where there appears some clear and unmistakable affirmative act or series of acts clearly indicating, either a present intent to relinquish the easement, or purpose inconsistent with its further existence.

*Carolina Land Co. v. Bland,* 217 S.E.2d at 21. Subsequently, the South Carolina Supreme Court further explained:

> " 'An abandonment occurs where the use for which the property is dedicated becomes impossible of execution, or where the object of the use for which the property is dedicated wholly fails. Any use which is not inconsistent with the declared purpose of a dedication will not support a charge of abandonment.' "

*K. & A Acquisition Grp., LLC v. Island Pointe, LLC,* 383 S.C. 563, 682 S.E.2d 252, 259 (2009) (quoting *City of Myrtle Beach v. Parker,* 260 S.C. 475, 197 S.E.2d 290, 295–96 (1973) (quoting 26 C.J.S. Dedication § 63 at page 552)).

South Carolina courts also have followed "the longstanding rule that an easement is extinguished upon the railroad's abandonment of the right of way for railway purposes." *Eldridge v. City of Greenwood,* 331 S.C. 398, 503 S.E.2d 191, 203 (App.) (*Eldridge II* ), *reh'g denied* (S.C.Ct.App.1998), *cert. denied* (S.C.1999).[18] Moreover, South

---

**18.** In *Eldridge II,* 503 S.E.2d at 199, although the issue was raised that "any taking of reversionary interests by the ICC's decision is a matter for federal and not state jurisdiction," the court disagreed and stated:

Neither the record before us nor the ICC decisions affecting this property mention any Trails Act issues. The relevant portions of the Trails Act were not enacted until March 1983. The ICC approved abandonment of the lines at

Carolina courts have held that railroads indicate intent to abandon a railroad easement by using an easement for " 'a use separate and distinct from railroad purposes or non-use for railroad purposes under such circumstances as to indicate an intention to abandon the right-of-way.' " *Eldridge I*, 388 S.E.2d at 250 (quoting *Lorick & Lowrance v. Southern Ry. Co.*, 87 S.C. 71, 68 S.E. 931, 931 (1910)). "[A]n intent to abandon has been found in a railroad conveying its right-of-way to another for purposes other than a railroad." *Eldridge I*, 388 S.E.2d at 251 (citing J.A. Connelly, Annotation, *What Constitutes Abandonment of a Railroad Right of Way*, 95 A.L.R.2d 468, 498 (1964)). Use for a non-railroad purpose constitutes abandonment because such use is " ' "inconsistent with the declared purpose of a dedication." ' " *K & A Acquisition Grp., LLC v. Island Pointe, LLC*, 682 S.E.2d at 259 (quoting *City of Myrtle Beach v. Parker*, 197 S.E.2d at 295–96 (quoting 26 C.J.S. Dedication § 63 at page 552)). Moreover, a non-railroad purpose constitutes abandonment because "a railroad company may only acquire property under authority of a statute or its charter and for purposes stated in its charter." *Eldridge I*, 388 S.E.2d at 250 (citing 65 Am.Jur.2d *Railroads* § 47 (1972)). "A railroad company takes property for public use on condition that it be used only for the purposes set forth in its charter." *Eldridge I*, 388 S.E.2d at 250. "Ownership of a right-of-way by a railroad company carries with it the right to use the property within the right-of-way for any purpose which furthers the business of the railroad." *Id.*

 Recreational trail use was not contemplated in 1857 when the South Carolina Legislature authorized the Port Royal Railroad to "construct a railroad," for the benefit of creating and operating a railroad, and called it a "right of way for said railroad," in the Port Royal Railroad Charter. Because the easements were acquired pursuant to the Port Royal Railroad Charter and subsequently conveyed by the Ports Authority to the BJWSA for purposes unrelated to oper-

ating a railroad, and use as a trail was not contemplated in the Port Royal Railroad Charter, under South Carolina law, the railroad easements were abandoned. Pursuant to South Carolina law, a conveyance for a purpose unrelated to operating a railroad, once consummated, terminates the railroad easement on the properties. *See K & A Acquisition Grp., LLC v. Island Pointe, LLC*, 682 S.E.2d at 259.

Similarly, the landowners who granted the Port Royal Railroad easements in the Fuller, Mack, Appleton and Mulford–Waterhouse deeds did so for railroad purposes, which ceased when the Ports Authority and the BJWSA signed their interim trail use/railbanking agreement to transfer the easements and the NITU was subsequently issued on May 20, 2009. The conveyance in the Fuller deed, dated May 27, 1870, of a "piece parcel or strip of land" to the Port Royal Railroad Company in "which the said railroad is to be constructed," refers repeatedly to the construction of the railroad in Beaufort County and expressly states that the conveyance is only to be for "uses & purposes of the said Road." In the context of the rest of the Fuller deed, and the earlier references in the Fuller deed to the Port Royal Railroad, in the opinion of this court, the word "Road" refers to the Port Royal Railroad, and the location "along which to locate run and establish the said Railroad." The Mack deed, dated July 23, 1870, also conveyed "to the said Rail Road Company the right of way over and through my said lot of land," and the Port Royal Rail Road was chartered "to construct a railroad." Consistent with the Fuller and Mack deeds, the Appleton deed, dated May 1, 1873, specifically granted an easement to the "Port Royal Rail Road Company" "for the use of the said Rail Road, which said three pieces of land have been surveyed and set apart by George Gage Engineer of said Port Royal Rail Road in accordance with an agreement between the parties herein." Finally, the Mulford–Waterhouse deed, dated July 12, 1881, specif-

---

issue here in 1978, and the trial judge found that the rails were removed between November 1982 and July 1983. Since no Trails Act conversion occurred, *Preseault [I]* does not

require the Respondents to seek compensation under federal law.
*Id.* at 200.

ically stated that the "said strip the [sic] track of the said Port Royal and Augusta Railway Company has been constructed to have and to hold the said strip of land unto the said Port Royal and Augusta Railway Company, their successors and assigns for the purpose of the operation of the said road so long as the same shall be used for such highway and no longer."

■■■ The easements acquired pursuant to the Port Royal Railroad Charter, and the Fuller, Mack, Appleton and Mulford–Waterhouse deeds, showed specific intent to convey for railroad purposes. When the Ports Authority transferred the railroad easements to the BJWSA, through the interim trail use/railbanking agreement, with the specific intent to convert to a public recreational trail, the easements no longer were to be used for railroad purposes. Moreover, the interim trail use/railbanking agreement, which preceded the issuance of the NITU, was "contingent upon the issuance of a NITU," by its very terms. The sale and transfer of the easements by the Ports Authority to the BJWSA, a non-railroad entity, was accomplished by a document which stated it was a "contract to purchase and interim trail use/railbanking agreement," "contingent upon the issuance of a NITU." *Beaufort R.R. Co.—Modified Rail Certificate*, STB Finance Docket No. 34943, 2009 WL 1416460, at *7. The interim trail use/railbanking agreement referenced the National Trails System Act several times and the express intention of the parties was to create a recreational trail, as then confirmed by the issuance of the NITU. The Ports Authority plainly transferred its easement interests in the rail line for purposes other than railroad purposes, as the interim trail use/railbanking agreement was intended to transfer the easements for future use as a recreational trail. Although the interim trail use/railbanking agreement indicated that the right to operate a railroad also transferred, these words were overridden by the stated intention of the parties immediately to develop a recreational trail on the easements, which clearly demonstrated that the easements were no longer to be used for railroad purposes. Furthermore, there is nothing in record before the court to even suggest an intent to reactivate an operating

railroad at any time in the future. When the NITU was issued, the railroad easements were extinguished because they no longer were to be used for the designated railroad purposes and plaintiff's properties no longer were burdened by the easements. The intent in the Port Royal Railroad Charter and of the Fuller, Mack, Appleton, and Mulford–Waterhouse source deed grantors was not consistent with uses other than railroad use and did not contemplate use as a recreational trail. Under South Carolina law, the easements, therefore, were abandoned, and, but for the issuance of the NITU, the property interests would have reverted to the plaintiffs in fee simple. The properties, therefore, should be valued as fee interests unencumbered by the easements.

In *Raulerson v. United States*, a Judge of the United States Court of Federal Claims applied South Carolina law to resolve valuation of easements which also formerly were held by the Port Royal Railroad, and which also were conveyed to the BJWSA for the creation of a recreational trail. *See Raulerson v. United States*, 99 Fed.Cl. 9. In a submission in the above captioned *Ingram* case, the government stated that the present plaintiffs' allegations are "identical" to the plaintiffs' allegations in *Raulerson*. In *Raulerson*, the court stated: "By conveying the easement to the BJWSA for non-railroad use, South Carolina would have abandoned its right to the easement under state law, causing the property to revert back to plaintiffs in fee simple. Because the Trails Act expressly prevents such reversion, plaintiffs have been subject to a taking that must be measured by reference to the fee simple value of their properties." *Id.* at 11. As in the *Ingram* case, the *Raulerson* parties also disagreed on the measurement of just compensation. *See id.* at 10. The Judge in *Raulerson* found that provisions in the railbanking agreement allowing for reactivation of a railroad in the future, with no present intent to do so, were insufficient to avoid abandonment. *See id.* at 12. The *Raulerson* court stated:

But for the Trails Act, the railbanking agreement would have effected an abandonment under South Carolina law, which

would have caused the easement to revert back to plaintiffs. Plaintiffs' damages must therefore be determined by reference to the fee simple value of their properties, unencumbered by any railroad easement. Ultimately, the measure of damages for just compensation must be the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.

*Id.; see also Carolina Plating Works, Inc. v. United States,* 102 Fed.Cl. 555, 560 (2011) ("Of course, nothing in the Rails–to–Trails Act precludes a finding that a railroad abandoned its right-of-way before the conversion to a trail, irrespective of the statute." (citing *Ellamae Phillips Co. v. United States,* 564 F.3d at 1372)).

Another Judge of the United States Court of Federal Claims also considered abandonment in a Rails–to–Trails case involving a South Carolina rail line, and how to value the takings at issue. *See generally Carolina Plating Works, Inc. v. United States,* 102 Fed.Cl. 555. The Judge wrote, "the parties disagree as to how to calculate the 'before' value of the property in question—that is, the value of the property before the takings in question." *Id.* at 559. The Judge also noted that "[i]n *Preseault II,* the Federal Circuit held that whether an abandonment has occurred is a question of 'fact, and the fact that question relates to a right of way taken by a railroad company does not make it one of law.'" *Id.* (quoting *Preseault II,* 100 F.3d at 1546). The Judge in *Carolina Plating* Works then found that, "[w]hile this court might ultimately conclude that, under South Carolina law, the railway in question was abandoned prior to the alleged takings here, the evidence at this point is too unsettled to allow the court to reach that conclusion as a matter of law." *Carolina Plating Works, Inc. v. United States,* 102 Fed.Cl. at 562; *see also id.* at 561 ("In the court's view, the existence of genuine issues of material fact precludes the court from determining, as

a matter of South Carolina law, that the railroad easements on the properties in question were abandoned prior to the alleged takings here, so as to leave plaintiffs' property unencumbered as of the time of the issuance of the NITU."). In the case before the court, contrary to the finding in *Carolina Plating Works,* the Port Royal Railroad Charter and the Fuller, Mack, Appleton and Mulford–Waterhouse deeds indicate specific intent that the easements conveyed were to be used for railroad purposes. Moreover, the interim trail use/railbanking agreement was "contingent on the issuance of a NITU," which gave clear intent that the easements were to be used for trail, not railroad, purposes. In addition, there is no evidence in the record to suggest that railroad operation is even contemplated for any time in the future.

■ No South Carolina case has been identified which specifically has considered whether railbanking is a railroad purpose. Under South Carolina state law, however, a use separate and distinct from railroad purposes indicates intent to abandon a right of way. *See Eldridge II,* 503 S.E.2d at 202;[19] *Lorick & Lowrance, Inc. v. Southern Ry. Co.,* 68 S.E. at 931–32. The United States Court of Appeals for the Federal Circuit has stated, "the Government's use of the property for a public trail constitutes a new, unauthorized, use." *Preseault II,* 100 F.3d at 1549. The United States Court of Appeals for the Federal Circuit in *Toews v. United States* also has written:

[I]t appears beyond cavil that use of these [railroad] easements for a recreational trail—for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through.... In the other, individuals or

19. The *Eldridge II* court also indicated that "[e]ven if we assume the Railroad did not abandon its easement prior to execution of the quitclaim deeds, we still reject the 'substitution of transportation' argument and conclude the easement was extinguished." *Eldridge II,* 503 S.E.2d at 202.

groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. *Toews v. United States*, 376 F.3d at 1376. The *Toews* court further wrote, "[s]ome might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other." *Id.* at 1376–77; *see also Thompson v. United States*, 101 Fed.Cl. at 433 ("In this case, by contrast, conversion of the Railroad easements into a public recreational trail transforms the nature of the easement and is substantially different from the original use.").

The defendant makes several additional arguments. First, defendant contends that because the interim trail use/railbanking agreement stated that it sold by quit-claim its interests in the property, "together with and including all rails and improvements located thereon and all rights of SELLER to operate a railroad on, upon and across said Property," the execution of the railbanking agreement is not evidence of an intent to abandon the easement. According to defendant, South Carolina has not abandoned use of the easements for railroad purposes, rather "additional use results in an additional burden on the land and not abandonment of the original easement." The government states:

> It is undisputed that South Carolina kept the tracks and ties in place, and maintained the tracks in a state of readiness for service. South Carolina kept the line in good repair, spending approximately $30,000 to keep the corridor operable. South Carolina also reserved its right to use the railroad easement in both its quit claim deed to BJWSA, as well as in the trail use agreement.

(citations omitted). In support, defendant cites to *Troha v. United States*, 692 F.Supp.2d 550, 564 (W.D.Pa.2010), a case decided by the United States District Court for the Western District of Pennsylvania, which applied Pennsylvania law. In the case currently before the court, however, South Carolina State law, not Pennsylvania State law, controls. *See Preseault I*, 494 U.S. at 20, 110 S.Ct. 914 (O'Connor, J., concurring); *Toews v. United States*, 376 F.3d at 1371; *Preseault II*, 100 F.3d at 1536, 1545–46; *Whispell Foreign Cars, Inc. v. United States*, 97 Fed.Cl. at 331.

Defendant's argument is too speculative. As indicated above, the record before the court does not contain even a suggestion that a railroad line would be reactivated across the easements at issue. As stated by the United States Court of Appeals for the Federal Circuit, "possible resumption of railroad operations at some undefined time in the future [is] of course self-serving and not indicative of the facts and circumstances" at the time of the taking, and does not defeat abandonment. *See Preseault II*, 100 F.3d at 1548. Although applying Missouri law, and not South Carolina law, a Judge of the United States Court of Federal Claims wrote:

> There is no question that this potentiality, insofar as these particular easements are concerned, exists purely in the realm of the hypothetical. No evidence was offered of a present intent to reinstate rail service in the future. Cases discussed in connection with abandonment seem to make it clear that such contingent possibilities do not forestall abandonment.

*Glosemeyer v. United States*, 45 Fed.Cl. 771, 780 (2000) (footnotes omitted). Moreover, courts in this Circuit have declined to find railbanking a railroad purpose or even a relevant consideration for analysis of a claim for a Trails Act taking. *See, e.g., Preseault II*, 100 F.3d at 1554 (Rader, J., concurring) (Rejecting the railbanking argument as a "vague notion," incapable of overriding the present use of the property as a recreational trail.); *Capreal, Inc. v. United States*, 99 Fed.Cl. 133, 146 (2011) (Interpreting Massachusetts law in which the court stated, "that railbanking is too hypothetical and unlikely to serve as a railroad purpose."); *Nordhus Family Trust v. United States*, 98 Fed.Cl. 331, 339 (2011) (Interpreting Kansas law, the court stated, "[i]n the present case, there is no evidence of any plan to reactivate the rail service—simply a speculative assertion by Defendant that some resumed rail service could occur in the future. The transfer of the easement to entities completely uncon-

nected with rail service, and the removal of all rail tracks on the corridor, lead the Court to conclude that any future rail use simply is unrealistic."); *Macy Elevator, Inc. v. United States,* 97 Fed.Cl. at 730 (Interpreting Indiana law and relying on *Preseault II* to deem railbanking "irrelevant to the question of whether a taking has occurred."); *Rogers v. United States,* 90 Fed.Cl. at 432 (Interpreting Florida law and indicating, "[h]ere, as in *Preseault II,* the use of the right-of-way as a public trail while preserving the right-of-way for future railroad activity was not something contemplated by the original parties to the Honore conveyance back in 1910."); *Glosemeyer v. United States,* 45 Fed.Cl. at 781 (Interpreting Missouri law, the court stated, "[i]n sum, neither component of railbanking—the preservation of the rail line for future use nor the 'interim' use of the easement as a recreation trail—constitutes a railroad purpose under Missouri law.").

Defendant also cites to the trial court decision of *Schneider v. United States,* No. 8:99–CV–315, 2003 WL 25711838 (D.Neb. Aug. 29, 2003), *recons. denied* (D.Neb. May 12, 2004), an unpublished decision issued by the United States District Court for the District of Nebraska. Defendant argues that the *Schneider* case addressed the issue of compensation to plaintiffs for a taking, "when a railroad easement burdened Plaintiffs' property at the time the NITU was issued." Defendant quotes *Schneider* as finding that a railroads' adherence to " 'the discontinuance procedure outlined in the [Trails Act] cannot constitute the decisive acts necessary to establish an intent to abandon an easement under state law.' " *Id.* at *5. Defendant points out the District Court for the District of Nebraska "declined to rule that the railroad abandoned its interest before the STB issued the NITU." (quoting *Schneider v. United States,* 2003 WL 25711838, at *5). The *Schneider* trial court decision, however, does not express the prevailing view on abandonment and is not binding on this court. Furthermore, *Schneider,* which was decided under

Nebraska state law, does not assist in understanding how to apply South Carolina law.

## CONCLUSION

In the above captioned case, but for issuance of the NITU, upon transfer of the easements for other than railroad purposes, the easements would have reverted to the plaintiffs in fee simple and plaintiffs would have held their property interests unencumbered by any easements. The measure of just compensation to the plaintiffs for the takings of plaintiffs' property should capture the value of the reversionary interests in their "before taken" condition, unencumbered by the easements. Therefore, the plaintiffs' motion for partial summary judgment is **GRANTED.** The defendant's cross-motion for partial summary judgment is **DENIED.** Further proceedings will be established by separate Order.

**IT IS SO ORDERED.**